**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **STANLEY A. LEITNER,** | ) | |
| **ID # 37078-177,** | ) | |
| **Movant,** | ) | |
| **vs.** | ) | **No. 3:10-CV-2515-G-BH** |
| | ) | **No. 3:07-CR-0261-G** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Respondent.** | ) | **Referred to U.S. Magistrate Judge** |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to Special Order 3-251, this case has been automatically referred for findings, conclusions, and recommendation. Based on the relevant filings, evidence and applicable law, the motion to vacate should be **DENIED**.

## I. BACKGROUND

Federal inmate Stanley A. Leitner (Movant) filed a *Motion to Vacate, Set Aside, or Correct Sentence* (Mot.) under 28 U.S.C. § 2255 challenging his federal conviction and sentence in Cause No. 3:07-CR-0261-G. The respondent is the United States of America (Government).

**A.    Factual & Procedural History**

On September 5, 2007, Movant was charged by indictment with: 1) wire fraud in violation of 18 U.S.C. § 1343 (counts one through five); 2) securities fraud in violation of 15 U.S.C. §§ 77q(a), 77x (count six); 3) failure to disclose compensation for promoting a security in violation of 15 U.S.C. §§ 77q(b), 77x (count seven); 4) money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (counts eight through fifteen); 5) money laundering in violation of 18 U.S.C. § 1956(a)(2)(A) (counts sixteen through twenty); and 6) engaging in illegal monetary transactions in violation of 18 U.S.C. § 1957 (counts twenty-one through twenty-seven). (*See* doc. 1).[1]

---

[1]  Unless otherwise noted, all document numbers refer to the docket number assigned in the underlying criminal action.

Movant pled not guilty and was tried before a jury on January 22-29, 2008.  Testimony presented at trial established that movant operated an investment fund, Megafund, from approximately April of 2004 to July of 2005.  Megafund required that investors invest a minimum of $10,000 and promised a 10% return on the investment each month. (R. 1:53-4, 64). Movant began Megafund after meeting with a James Rumpf, who represented that he had extensive investment experience and that this investment scheme would give movant a 30% return per month on funds sent to Rumpf, who would then send them to a trader. (R. 4:599, 700-05).  Rumpf and his attorney also told movant that this was not a security. (R. 4:708).  Movant did not have his own money to invest in this fund, but he solicited investments from others with a plan to give the investors a 10% return and keep the remaining 20% return for himself. (R. 4:594-95, 715-16, 863-64).

A number of investors testified at trial.  Several of them testified that movant told them that the money would be held in a "sole signatory account" in Megafund's name to which only movant would have access. (R. 1:53-56, 124-25, 131-32, 139, 218).  Investors also testified that movant told them that the funds would never leave the account and were instead only to be used as collateral for the trader (R. 2:120-21, 140, 142, 214), and that the investment money would remain either in a major U.S. bank or brokerage account (R. 2:124-25, 188, 214, 226).  In actuality, movant sent the money to Rumpf to either an account in the Netherland Antilles or Farmers & Merchants Bank in Krum, Texas.  Rumpf sent the money to an unknown trader, and movant had no control over the money once he sent it to Rumpf.  (R. 2:161-62; R. 3:370-74; R. 4:636; R. 5:823-24).  Some investors also testified that movant told them he had set aside $50 million of his own dollars as a reserve, and that he had invested $100,000 in a similar investment that had performed well; movant did not have any money to do either of these things and had no investment experience. (R. 1:56; R. 2:122-24,

160, 243; R. 4:593-94; R. 5:802-03).

Investors also testified that movant told them that he had an insurance policy that guaranteed their principal investment even in the case of fraud, and that his attorney had read the policy, and he showed them a letter from an attorney verifying the policy's contents. (R. 2:127-31, 191-94, 203-04, 214-15, 246, 253-54; R. 3:526-27).   The attorney, Ken Humphries, testified that he signed a letter verifying the contents of the policy without ever seeing the policy, and that his name was forged on a second letter that provided additional details on the policy and the account where the funds were allegedly kept. (R. 3:401-16, 419-22).   In reality, there was no valid insurance policy, and movant testified that he told investors about the policy before receiving any copy of any policy from Rumpf. (R. 2:159; R. 5:829).

In late March of 2005, movant hired an attorney who had securities experience, Vivian Aichele, to be general counsel for Megafund.   In early April, Aiechle and outside counsel informed movant in a conference call that his investment scheme was a security in violation of securities law and needed to be shut down. (R. 3:473-74; R. 4:596).   Rather than tell the investors this information, movant initially sent a letter to the investors informing them that the fund was full and would not accept further investments. (R. 4:596-97).   After that point, however, movant accepted an additional $6.5 million in investments, forwarding some of the money to Rumpf and some to an associate, Travis Correll, as a short-term loan.   (R. 3:375-76; R. 4:571-73).   While movant did ask Rumpf to return investors' money after he spoke to Aichele, and actually received $2 million back, he forwarded less than $1 million of that to the investors and used the rest to fund his own side investments in a movie and television network. (R. 4:572-73).   In the end, a court-appointed receiver took control of Megafund in July of 2005 and determined that movant received approximately $17

million in investments in Megafund, roughly $11 million of which was sent to Rumpf, and $9.5 million of which was forwarded to a Brad Stark who spent it on lavish items for himself and family members. (R. 2:146-52).

Ron Loecker, an IRS agent testified regarding an interview movant gave to both agents and prosecutors. Before the interview, movant was advised of his right to have an attorney and to remain silent. During this interview, movant said that Rumpf had told him that there was an insurance policy, but that he was not going to give movant a copy because it had the name of the broker on it. Movant also told the agents that money was transferred overseas because Rumpf has a problem with the IRS, but movant did not tell investors this information. (R. 4:585-86). Movant acknowledged in this interview that some of the schematics included in the packet given to Megafund investors did not describe how Megafund actually worked, that he did not understand some of the language in the packet because they were documents he received from Rumpf, that some of the statements in the packet were not true, and that he knew people would rely on the packet. (R. 4:588-91). Movant also admitted to the agents that the letter he sent to investors after Vivian Aichele advised him to shut Megafund down was inaccurate because it only said that the fund was full and was therefore not accepting further funds. (R. 4:596-97). Loecker also testified that movant passed Rumpf's promises to him on to the investors as his own promises, and that movant acknowledged misstating facts, but movant intended to make money for himself and his investors. (R. 4:605, 618).

Movant testified in his own defense at trial that he had a good faith belief in the investment as explained to him by Rumpf and Rumpf's attorney. While he disputed some of the testimony of certain investors and his two attorneys who testified at trial, movant acknowledged that: 1) Rumpf never told him the trader's name, and he never told the investors that he did not know the trader or

anything about him (R. 4:703; R. 5:813); 2) his first investor was paid his 10% return out of another of movant's accounts for four months because Rumpf did not send profits for those months, but movant never told this investor that the money he received was not actually profits on his investment (R. 5:720, 799); 3) movant did not see a copy of the insurance policy Rumpf said he had on the investments until February of 2005, several months after he had told investors about the policy, and he never verified its existence before then (R. 5:815-16); 4) he never told the investors about Rumpf's existence, including that Rumpf did not believe in the IRS and had anti-government views, or that he would no longer have any control over the money after it was sent to Rumpf, or that much of the money was being sent overseas (R. 5:792, 800, 803); 5) he never told the investors that he would make 20% return on the investments per month (R. 4:708-09); 6) he did not tell investors that he kept some of their investment money and used it for his living expenses and to invest in other projects because he viewed this money as his future 20% return on the investments (R. 4:724-25; R. 5:855-59); 7) he never told the investors that the packet of documents he gave them were copies of documents he received from Rumpf, with the name Megafund substituted for the name of Rumpf's investment (R. 4:703-04; R. 5:); 8) he was told in April of 2005 by attorneys that Megafund was a security and was in violation of the law but sent out a letter that said that the fund was closed because he did not want to cause "a run on the bank" by telling the investors the truth (R. 4:721; R. 5:829, 831); and 9) after he was told that the fund was in violation of SEC regulations, he accepted further investments in the program without advising the investors of this fact, forwarding over $5 million dollars to Rumpf and keeping the remainder for his own uses. (R. 4:725; R. 5:829-841).

Movant was convicted on all counts.  (*See* doc. 41).[2]  At his sentencing hearing on July 8,

---

[2]  There was no count twenty-one in the indictment, so movant was in actuality convicted of all twenty-six counts charged in the indictment

2008, the district court sustained objections to the pre-sentence report from both parties.  It determined that based on the convictions for wire fraud and money laundering, the applicable guideline sentencing range for all convictions together would be between 210 and 262 months imprisonment.  (doc. 63 at 58).  After hearing testimony and argument, the district court then found that given the total loss of more than $10 million to the victims, no factors listed in 18 U.S.C. § 3553(a) warranted a sentence outside of this range (*Id*. at 58-60).  The court sentenced movant to 210 months confinement on counts one through five, 60 months for counts six and seven, 210 months for counts eight through twenty, and 120 months for counts twenty-two through twenty-seven, to run concurrently and to followed by three years of supervised release.  (*See* doc. 48).  The Fifth Circuit affirmed movant's convictions and sentence in an unpublished opinion on September 21, 2009.  *United States v. Leitner*, No. 08-10681 (5th Cir. Sept. 21, 2009).  Movant did not file a petition for certiorari with the Supreme Court.

**B.**    **Substantive Claims**

Movant filed his motion to vacate and supporting memorandum ("Mem.") on December 9, 2010.  In his motion and memorandum, he asserts the following twelve grounds for relief:

(1)  his trial attorney rendered ineffective assistance of counsel by failing to:

-conduct reasonable and adequate pretrial discovery and failing to adequately prepare for trial(grounds one and two);

-permit proper introduction of material exculpatory evidence (ground three);

-subpoena and call material witnesses at the guilt phase of the trial (grounds four and five);

-assert the attorney-client privilege when former counsel were subpoenaed to testify and compelled to testify against movant (ground six);

-respond to and act on notes from movant during trial pointing our errors and

6

     inaccuracies of prosecution witnesses (ground seven);

     -move to suppress and to object to inflammatory evidence and argument (ground eight);

     -properly prepare, interview, and confer with witnesses prior to the sentencing hearing (ground nine); and

  (2) his appellate attorney rendered ineffective assistance of counsel on direct appeal by:

     -failing to confer with movant in preparation of the direct appeal (ground ten);

     -failing to raise as points of error meritorious, non-frivolous grounds on appeal (ground eleven); and

     -refusing to assist movant by preparing an amended brief (ground twelve).

(*See* Mot. at 7-8, 12-15).   The Government filed a response brief on April 21, 2011.   (*See* Resp. Opp'n Mot. ("Resp.")).   Movant filed a reply brief on July 10, 2011.

## II.  SCOPE OF RELIEF AVAILABLE UNDER § 2255

  "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice."  *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996) (citations and internal quotation marks omitted).   It is well established that "a collateral challenge may not do service for an appeal."  *United States v. Shaid*, 937 F.2d 228, 231 (5th Cir. 1991) (*en banc*) (quoting *United States v. Frady*, 456 U.S. 152, 165 (1982)).

  A failure to raise a claim on direct appeal may procedurally bar an individual from raising the claim on collateral review.  *United States v. Willis*, 273 F.3d 592, 595 (5th Cir. 2001).   Defendants may only collaterally attack their convictions on grounds of error omitted from their direct

appeals upon showing "cause" for the omission and "actual prejudice" resulting from the asserted error. *Shaid*, 937 F.2d at 232. However, "there is no procedural default for failure to raise an ineffective-assistance claim on direct appeal" because "requiring a criminal defendant to bring [such] claims on direct appeal does not promote the[] objectives" of the procedural default doctrine, "to conserve judicial resources and to respect the law's important interest in the finality of judgments." *Massaro v. United States*, 538 U.S. 500, 503-04 (2003). The Government may also waive the procedural bar defense. *Willis*, 273 F.3d at 597.

### III.  INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

In his first eight grounds for relief, movant asserts that his trial counsel provided ineffective assistance.

The Sixth Amendment to the United States Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. art. VI. The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel, both at trial and on appeal. *Strickland v. Washington*, 466 U.S. 668 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). To successfully state a claim of ineffective assistance of counsel, the prisoner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced his or her defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). A failure to establish either prong of the *Strickland* test requires a finding that counsel's performance was constitutionally effective. *See* 466 U.S. at 696. The Court may address the prongs in any order. *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

In determining whether counsel's performance is deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Strickland*,

466 U.S. at 689. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* at 691. To establish prejudice, a movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (inquiry focuses on whether counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair). Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent counsel's alleged errors. *Strickland*, 466 U.S. at 695-96.

To show prejudice in the sentencing context, the movant must demonstrate that the alleged deficiency of counsel created a reasonable probability that his sentence would have been less harsh. *See Glover v. United States*, 531 U.S. 198, 200 (2001) (holding "that if an increased prison term did flow from an error [of counsel] the petitioner has established *Strickland* prejudice"). One cannot satisfy the second prong of *Strickland* with mere speculation and conjecture. *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992). Conclusory allegations are insufficient to obtain relief under § 2255. *United States v. Woods*, 870 F.2d 285, 288 n.3 (5th Cir. 1989); *United States v. Daniels*, 12 F. Supp. 2d 568, 575-76 (N.D. Tex. 1998); *see also Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (holding that "conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding").

A.    **Trial Preparation**

In his first ground for relief, movant asserts that counsel failed to conduct reasonable and adequate pretrial discovery because he did not interview material witnesses and obtain exculpatory

evidence in the form of prior statements made by prosecution witnesses.  In his second ground, movant claims that counsel failed to adequately prepare for trial by only conferring with movant for four hours and by admitting to movant that he did not read movant's nine-page synopsis of the history of the case.  Movant submits a copy of this synopsis and affidavits from prosecution witnesses Jerry Hobbs and Gordon Brown stating that counsel did not contact them or attempt to interview them prior to their testimony at trial.  (Mot., Ex. 1, 2).

When alleging that counsel was ineffective for failing to fully investigate a case, "[a] movant 'must allege with specificity what the investigation would have revealed and how it would have altered the outcome' of the proceeding." *Potts v. United States*, 566 F. Supp. 2d 525, 537 (N.D. Tex. 2008) (accepting recommendation of Mag. J.) (quoting *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)); *see also Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005) (same, applied in case where habeas petition was brought by state prisoner).  Even accepting movant's claims as true, he has not shown what further pretrial preparation or discovery would have revealed or how it would have changed the outcome of his trial.  Although he claims that prior statements of an IRS agent and the SEC receiver could have been used to impeach them or prove his innocence, he does not allege how.  Movant also asserts that because counsel attorney did not read his synopsis of events, he was not adequately prepared for trial.  The record reflects that counsel questioned movant in great particularity about Megafund, how it began, how it operated, and his sincere belief in the investment. (R. 4:664-742).  This belies the assertion that counsel was unfamiliar with the facts of the case, and movant has not alleged what further information counsel should have gleaned from the synopsis.

Finally, movant asserts that his attorney should have spoken to two prosecution witnesses before they testified at trial, but again does not allege how this would have altered the outcome.  The

record reflects that both Hobbs and Brown testified that they are retired pastors.  Hobbs testified that

he and several family members invested in Megafund, he received a commission for investors he

introduced to the program, he told other investors what movant told him, he understood that movant

had invested his own $100,000 in Megafund, he believed that the money would be held in a sole

signatory account that was not overseas and that money would remain in account to be used as

collateral for investments, and he stopped recommending Megafund after Vivian Aichele

recommended that Megafund end. (R. 2:223-43).   Brown, who works for non-profit agencies,

testified that he did not invest in Megafund but knew movant was interested in humanitarian causes

and had stated an interest in having a portion of Megafund's profits go to charities.  Brown also

testified that he introduced movant to the attorney, Ken Humphries.  (R. 2:251-77).  Defense counsel

cross-examined Hobbs about movant's sincerity and belief in the investment (R. 2:246), and he

cross-examined Brown about movant's efforts to obtain a copy of the insurance policy from Rumpf,

along with movant's efforts to retrieve investors' money from Rumpf after learning that the fund

was not in compliance with SEC regulations. (R. 2:317-26).  Movant has neither alleged nor shown

any further testimony Hobbs or Brown could have given at trial that would have had an effect on

the outcome.  His first and second grounds for relief should be denied.

**B.**     **Exculpatory Evidence**

        Movant claims in his third ground for relief that counsel was ineffective for failing to present

exculpatory evidence at trial, including the insurance policy from Rumpf and forged documents he

got from Stark when he tried to get money back from him.  The insurance policy became effective

in 2004 and lists Sardaukar Holdings as the insured party. (Mot., Ex. 3).  This policy was admitted

into evidence during counsel's direct examination of defense witness Larry Frank, who originally

introduced movant to Rumpf.  Frank further testified that he himself believed that this policy protected the investments, and that he took movant a copy of this policy when movant requested it. (R. 4:632-38).  In his reply, movant complains that the policy was not provided by the government until the "eleventh hour" and that only a redacted portion of the policy was admitted into evidence at trial.  He also points out that two other documents provided to him by Stark when movant finally met him shortly before the FBI raided Megafund's office were not turned over by the government, and were therefore not offered into evidence by counsel. (Reply at 8).

Movant does not explain how an alleged failure by the government to give the defense favorable documents constitutes ineffective assistance by his counsel, because the duty to disclose potentially exculpatory or mitigating evidence is an affirmative duty of the State.  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Movant does not establish that either the policy or the additional bank documents he got from Stark are, in fact, exculpatory material as defined in *Brady*.  In *Brady*, the Supreme Court held that a prosecutor must disclose evidence to a criminal defendant if that evidence is favorable to the defendant and material to his guilt or punishment.  *Id*. at 87.  Evidence is material within the meaning of *Brady* only when there is a reasonable probability of a different result at trial had the evidence been disclosed.  *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995).  At trial, the defense offered the insurance policy as evidence of movant's good faith belief that the money sent to Rumpf from investors was insured.  It does not show, however, that movant did not make misleading material statements or did not omit material information in communications with investors with the specific intent to deceive in order to gain financial profit for himself.  Likewise, the documents from Stark, which movant testified about at trial, were evidently forged and had been given to him to show that the investors' money had been allegedly frozen by the banks and could

not be returned.  (R. 4:735-39).  This is evidence that Stark lied to movant, but it does not exculpate

him from his own lies and omissions.  The jury was instructed that movant was guilty of wire fraud,

the charge with the longest potential sentence if the government proved beyond a reasonable doubt

that he made material misrepresentations in furtherance of a scheme to defraud for financial gain.

(doc. 38 at 14-5).  None of these documents exculpates movant's own testimony admitting that he

made material misrepresentations in furtherance of his scheme to bring financial gain to himself.

Movant's third ground for relief is without merit.

## C.   Failure to Call Witnesses at the Guilt Phase of Trial

Movant asserts in his fourth and fifth grounds for relief that his trial counsel failed to call

material witnesses at trial and to move for a continuance when one of these witnesses became

unavailable to testify.  He claims counsel should have subpoenaed James Rumpf and Brad Stark to

testify and sought a continuance when Rumpf's attorney, Aaron Keiter, who had been subpoenaed,

was unavailable to testify due to another federal case.

The Fifth Circuit has held that complaints of uncalled witnesses are not favored in habeas

corpus review because the presentation of testimonial evidence is a matter of trial strategy and

because allegations of what a witness would have stated are largely speculative.  *Day v.

Quarterman*, 566 F3d 527, 538 (5th Cir. 2009).  To prevail on an ineffective assistance claim based

on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the

witness was available to testify and would have done so, set out the content of the witness's

proposed testimony, and show that the testimony would have been favorable to a particular defense.

*Day v. Quarterman*, 566 F3d at 538; *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).

Movant contends that Rumpf and Keiter were necessary witnesses because he relied on their

expertise in modeling his investment program, and that Stark could have testified about movant's efforts to recover investor funds. (Mot. at 8; Mem. at 3-4).   However, movant has presented no evidence in the form of affidavits from these witnesses demonstrating that they were willing to testify, would have done so, and would have given the favorable testimony for movant that he outlines.[3] Even assuming they would have testified as movant states, the government never disputed that movant relied upon Rumpf and Keiter and their documents and statements in setting up Megafund, and that he did not know about Stark, and that he met with Stark after he discovered his existence in an effort to retrieve investor funds.   Movant was prosecuted and convicted for the material representations he made to his investors that he knew were false and for the material information he omitted from telling his investors.   While movant contends that testimony from these witnesses would have been evidence of his good faith belief in the investment, the jury was specifically instructed that good faith is not a defense under federal law where, in carrying out a venture, "the defendant knowingly made false or fraudulent representations to others with the specific intent to deceive them." (doc. 38 at 11).   Movant admitted he made such representations both during his testimony at trial and in his statement to investigators before trial.   Movant's fourth and fifth grounds are without merit.

**D.**     **Attorney-Client Privilege**

In his sixth ground for relief, movant argues that counsel was ineffective for failing to invoke the attorney-client privilege on his behalf to bar both Ken Humphries and Vivian Aichele from giving testimony at trial regarding confidential communications with movant. (Mem. at 5).   The government responds that assuming movant had an attorney-client relationship with Ken Humphries,

---

[3]  Movant has submitted an affidavit from Gregg Harris stating what he believes Rumpf and Keiter would have testified to if called. (Mot., Ex. 6).

his testimony was permissible under the crime-fraud exception to that privilege where the communication with the client was intended to further criminal or fraudulent activity. The government further contends that movant did not have an attorney-client relationship with Vivian Aichele because she was hired as an attorney for Megafund, not movant. (Resp. at 18-25).

Even assuming, without deciding, that counsel was ineffective for not invoking the attorney-client privilege, movant has shown no reasonable probability that he would not have been convicted absent the testimony of these two witnesses about their communications with movant. As noted earlier, Humphries testified that he wrote a letter verifying the existence of an insurance policy that allegedly insured the investments without ever seeing the policy. Aichele testified that she informed movant that his investment was a security that was not in compliance with federal law. Much of this information, however, was also given through the testimony of others. Jerry Hobbs, one of the men who recommended the program to others and received a commission, testified that he was at the Megafund office when Vivian Aichele visited and recommended that Megafund cease and desist, and he testified that he stopped recommending Megafund to others at that point. (R. 2:242-43). Gordon Brown, who was also paid by movant, testified that he referred movant to Ken Humphries as an attorney who could verify the insurance policy, and he testified that he was in the meeting when Aichele told movant that Megafund was a security that was not in compliance with the SEC and should be shut down. His understanding was that movant was going to send a letter to the investors at that point shutting down the fund. (R. 2:270-77). Most importantly, IRS Agent Loecker testified that movant told federal agents that Rumpf did not initially give him a copy of the insurance policy, and in fact did not let him see it because the trader's name was on it. (R. 4:585). Loecker further testified that movant admitted that Aichele told him to shut down Megafund because it was

15

not in compliance, and that the letter he then sent to investors was misleading and inaccurate. (R. 4:596-97). Likewise, movant acknowledged in his testimony that he did not see the insurance policy until months after he began Megafund, but hr did not advise investors that he did not know what the policy allegedly said or covered. He further admitted that he was told that Megafund should be shut down, but he continued to accept investment funds. (R. 4:716, 723).

Even without Humphries' and Aichele's testimony, there was evidence that movant saw no insurance policy for many months but did not tell investors this fact, and that he was told by attorneys in April of 2005 that Megafund was a security in violation of federal law but failed to shut it down and instead accepted millions of dollars of additional investments without informing the investors of the truth. Movant has not met the *Strickland* standard with regard to his sixth ground, and it is without merit.

## E.   <u>Notes from Movant</u>

In his seventh ground, movant asserts that counsel was ineffective for failing to respond and act on movant's notes to him regarding inaccuracies in the testimony. He contends that counsel failed to elicit testimony from the court-appointed receiver that movant was also a victim of fraud. (Mot. at 13, Mem at 5). Counsel cross-examined most of the government's witnesses, clarifying and eliciting testimony about movant's sincere interest in the investors and their concerns. (R. 1:49; R. 2:97, 103, 122-26, 158-65, 169, 187-89, 207, 244-50; R. 3:315-34, 384-87, 412-17, 427-28, 435, 444-47, 487-96; R. 4:562-67, 604-18). The receiver testified during cross-examination that movant believed Rumpf's representations that money would be made with this investment, that movant's daughter invested in the program, and that movant did not spend money on extravagant purchases, only on living expenses and enterprises that he believed were deserving of funds. (R. 2:162-65).

Movant also testified in great detail about his belief in the investment program and his disagreement with certain testimony by government witnesses.  The record reflects that counsel elicited testimony supporting movant's good faith defense.  Movant has not identified any testimony that was inaccurate that counsel failed to address or shown how the failure to correct the alleged inaccuracy prejudiced him.  This claim is without merit.

## F.   Inflammatory Evidence and Argument

In his eighth ground for relief, movant contends that trial counsel was ineffective for failing to either move to suppress inflammatory testimony and argument about movant's associate, Travis Correll, or to object to this testimony and argument.  Correll was an investor in Megafund to whom movant advanced several loans from money he received from investors after he was told that Megafund should be shut down.  (R. 4:573; R. 5:837-38).  The IRS agent Loecker testified that Correll's own investment fund was under receivership because it was a fraudulent investment scheme.  (R. 3:374).  While explaining during closing argument that movant transferred $800,000 in investor funds to Correll as a loan, the prosecutor stated that Correll was a convicted felon. (R. 5:885).  Movant contends that the government was attempting to convict him of guilt by his association with Correll.

Movant has shown no prejudice in trial counsel's failure to object to this testimony and argument.  First, in neither instance did the government contend that movant was guilty based on Correll's actions.  The testimony and argument related to the time after movant learned that Megafund was in violation of securities law and continued to receive investor funds, sending some of that money to Correll.  Movant has not shown a reasonable probability that these brief statements in a lengthy trial had a prejudicial effect.  This ground is without merit.

**G.**     **Preparation for Sentencing**

In his ninth ground for relief, movant asserts that trial counsel did not adequately prepare for his sentencing hearing because he failed to interview the people who testified for movant beforehand.  Movant acknowledges that three people testified on his behalf but maintains that he might have received leniency if trial counsel had consulted with them.  (Mot. at 14).  He submits affidavits from his daughter Stacy Leitner, Gordon Brown, and Gregg Harris, all stating that they testified at punishment, but did not speak to counsel beforehand.

Movant has not shown a reasonable probability that further consultation with these witness would have resulted in a lower sentence.  At the sentencing hearing, all of these witnesses were allowed to make whatever statement they wished to make on movant's behalf, including statements regarding his religious faith, his poor health, and his good works and charitable efforts on behalf of others. (doc. 63 at 8-20).  Counsel also pointed out that movant's wife, three sisters, and three other friends were present.  (*Id.* at 20).  Movant also gave a lengthy statement.  (*Id*. at 21-41).  The court noted receipt of several letters in support from friends and family.  (*Id*. at 5).  Two investors testified that they did not personally hold any hard feelings towards movant.  (*Id*. at 55-56).  The court ruled that based on the amount of loss suffered by the victims, it would not deviate from the sentencing guidelines, and it sentenced movant to the lowest possible sentence within the guidelines.

Counsel presented a viable case for leniency for movant at sentencing.  He successfully objected to enhancements to the sentence proposed in the PSI.  (*Id*. at 4-5).  The statements of movant's witnesses were not discounted by the court.  His sentence was based on the total loss of money to the victims, and counsel could not change that fact.  Movant has not met the *Strickland* standard with respect to this claim, and it is therefore without merit.

In conclusion, movant's claims of ineffective assistance of trial counsel should be denied.

## IV. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Movant also asserts in his final three grounds for relief that his appellate counsel was ineffective for failing to confer with him in preparation of the appeal, for failing to raise meritorious grounds on appeal, and for refusing to assist in preparing an amended brief.

The federal constitution also guarantees a criminal defendant the effective assistance of counsel on appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Whether appellate counsel has been ineffective is also determined by using the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, petitioner must show a reasonable probability that but for his counsel's deficient representation, he would have prevailed on his appeal. *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001).

To render effective assistance of counsel, appellate counsel need not raise every non-frivolous issue on appeal. *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999). "Instead, to be deficient, the decision not to raise an issue must fall 'below an objective standard of reasonableness.'" *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000) (quoting *Strickland*, 466 U.S. at 688). "[A] reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful. Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *Williamson*, 183 F.3d at 462-63 (footnote and citations omitted). To determine whether appellate counsel was deficient, courts must consider whether the challenge "would have been sufficiently meritorious such that [counsel] should have raised it on appeal." *Phillips*, 210 F.3d at 348.

Movant has not shown, as alleged in his tenth ground, that appellate counsel was ineffective

for failing to confer with him personally or by telephone instead of by mail.  Movant has submitted the correspondence between movant and his appellate counsel as an exhibit.  The letters reflect that counsel was conferring with movant about his direct appeal. (Mot., Ex. 7).  Movant's complaint is with the type and frequency of communication, but this alone does not prove ineffective assistance of counsel under the *Strickland* standard.

In his eleventh and twelfth grounds for relief, movant asserts that appellate counsel was ineffective for failing to raise a claim that the prosecution withheld evidence in violation of *Brady v. Maryland* and for failing to file an amended brief raising an issue under *Santos v. United States*, 553 U.S. 507 (2008), with regard to his money laundering convictions.  In a letter to movant dated March 15, 2009, counsel explained that he did not raise *Brady* and the other claims urged by movant because the issues were rendered moot when movant testified and admitted to committing wire fraud.  In a letter dated April 28, 2009, counsel explained that he did not raise *Santos*, a case in which the Supreme Court held that the term "proceeds" in the money laundering statute refers to profits and not receipts in an illegal gambling case, because he viewed that case as being limited to gambling operations.  Counsel explained that he would not file an amended brief raising *Santos* because movant's guideline sentence range would not change even if he had not been convicted of money laundering (which he admitted to during his testimony).  In explaining why he would not raise *Santos* as a claim, counsel cited to *United States v. Fernandez*, 559 F.3d 303, 315-16 (5th Cir. 2009), in which the Fifth Circuit held that any alleged *Santos* error concerning the definition of the word "proceeds" in the jury instructions would be analyzed under the plain error standard, the standard used for claims raised for the first time on direct appeal.  (Mot., Ex. 7).

Movant has not shown that his appellate counsel was ineffective for failing to raise additional

points of error.  Movant's contention that the government's failure to provide the defense with copies of the insurance policy and the documents Stark provided him in June of 2005 is a *Brady* violation is unsupported.  As noted earlier, the insurance policy was admitted into evidence at trial. Neither it nor the documents Stark gave him when movant was trying to retrieve investors' money is exculpatory or impeachment evidence.  While it may be evidence that Rumpf and Stark deceived movant, movant was convicted based on his own misrepresentations and omissions.  Counsel was not ineffective for failing to raise this issue.  *See United States v. Phillips*, 210 F.3d at 348  (holding that attorneys do not render deficient representation by failing to present meritless claims on appeal).

With regard to movant's claim that counsel was ineffective for failing to raise a *Santos* claim, movant has failed to establish either deficient performance or prejudice.  He was convicted in January of 2008.  *Santos* was handed down by the Supreme Court six months later, on June 2, 2008. *Santos*, 553 U.S. at 507.  Appellant's initial brief was filed with the Fifth Circuit on February 6, 2009.  *See* 2009 WL 4900086.  As counsel noted in his letter to movant, the Fifth Circuit specifically held in *Fernandez* that any alleged error under *Santos* would have to be plain error when it was not raised at trial. Counsel gave his opinion that there was no plain error in movant's case.  Movant has not shown that counsel's failure to raise *Santos* on direct appeal fell below an objective standard of reasonableness.  Additionally, in *Garland v. Roy*, 615 F.3d 391 (5th Cir. 2010), the Fifth Circuit recognized that three other circuits have held that *Santos* should be read to apply only to convictions for money laundering from running an illegal gambling operations, two other circuits have held that proceeds should be defined as profits unless the legislative history indicates otherwise under *Santos*, and two other circuits have held that *Santos* may apply to various types of money laundering convictions depending on the particular facts involved.  The Fifth Circuit went on to interpret *Santos*

in yet a different way.  *Id*. at 402-03.  Given the disagreement between the various circuit courts on

the applicability of *Santos*, and the Fifth Circuit's relatively recent opinion on the subject, movant's

appellate counsel was not deficient in his analysis of then current case law.

Furthermore, movant has shown no prejudice for the failure to raise *Santos* on direct appeal.

First, the Fifth Circuit has refused to find plain error in several cases where *Santos* was raised as a

ground on direct appeal.  *See United States v. Diaz*, 420 Fed. Appx. 456, 460  (5th Cir. Apr. 4,

2011); *United States v. Arbuckle*, 390 Fed. Appx. 412, 415 (5th Cir. Aug. 17, 2010); *United States*

*v. Cook*, 589 F.3d 173, 181-82 (5th Cir. 2009); *United States v. Gonzalez*, 331 Fed. Appx. 289, 290

(5th Cir. Aug. 5, 2009).  Second, even if movant's money laundering convictions been overturned,

there is no reasonable probability that his sentence would change.  Movant was sentenced to 210

months, the low end of the guideline sentence for his convictions for both money laundering *and*

wire fraud.  Movant's convictions for wire fraud, as well as his convictions for securities fraud,

failure to disclose compensation, and illegal monetary transactions, would be unaffected by any

potential *Santos* error.  The district court declined to sentence movant to a shorter sentence

specifically because of the large total loss to movant's victims.  This loss is also unchanged by any

potential *Santos* error.  There is no reasonable probability that the result would have been different

had this issue been raised on appeal.  Movant's ten, eleventh, and twelfth grounds for relief are

without merit and should be denied.

## V.  EVIDENTIARY HEARING

Upon review of the motion to vacate and the files and records of this case, an evidentiary

hearing appears unnecessary.  No evidentiary hearing is required when "the motion and the files and

records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255.

Here, the record conclusively shows that movant is entitled to no relief.

## VI.  RECOMMENDATION

The *Motion to Vacate, Set Aside, or Correct Sentence* pursuant to 28 U.S.C. § 2255 should

be **DENIED** with prejudice.

**SIGNED this 27th day of October, 2011.**

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE